UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| **JENNIFER L. IMPASTATO** | **CIVIL ACTION NO.:** |
| **VERSUS** | **SECTION: " "** |
| **PAMLAB, LLC** | **MAGISTRATE ( )** |

### COMPLAINT AND JURY DEMAND

**COMES NOW** Plaintiff Jennifer L. Impastato, through undersigned counsel, and files this complaint to obtain full and complete relief and to redress the unlawful employment practices described herein.

**I.     PRELIMINARY STATEMENT**

1. This action for employment discrimination and retaliation against Pamlab, LLC, seeks declaratory, injunctive and equitable relief, back pay, reinstatement (or in lieu thereof, front pay), compensatory damages, punitive damages, attorney's fees, and costs for discrimination on the basis of sex and disability and for retaliation for its treatment of Jennifer L. Impastato.

**II. JURISDICTION**

2. This action is brought pursuant to Title VII of the Civil Rights act of 1964, 42 U.S.C. § 2000e *et. seq*. and the Americans with Disabilities Act ("ADA"), Title 42, Section 12101 et seq., as amended by the ADA Amendments Act of 2008 (ADAAA).

3. Jurisdiction is invoked over the federal claims pursuant to 28 U.S.C. § 1331. The Plaintiff has received her right-to-sue letter on or about May 11, 2011. 42 U.S.C. § 2000e-5(f).

4. Declaratory, injunctive, and equitable relief is sought pursuant to 42 U.S.C. 2000e-5(g).

**III. VENUE**

5. This action properly lies in the Eastern District of Louisiana because the claims arose while Plaintiff was employed in St. Tammany Parish, Louisiana.

### IV. PARTIES

6. Plaintiff Jennifer L. Impastato, (hereafter referred to as "Plaintiff" or "Impastato") is a United States citizen and a resident of the state of Louisiana. Plaintiff was an employee of Pamlab, LLC. from July 23, 2007 until she was terminated from her employment on September 13, 2010..

7. Pamlab, LLC (hereafter referred to as "Pamlab") is a corporation authorized to do business in Louisiana and is an employer within the meaning of 42 U.S.C.§2000e.

### V. FACTS

8. Plaintiff was hired on July 23, 2007, by Pamlab to work as a Marketing Associate.

9. In 2008 Impastato was diagnosed with depression. She was treated by a physician, who prescribed Cymbalta and Deplin to treat her disability.

10. Many people at Pamlab, including her manager, were aware of her disability.

11. From 10/07 through 01/09, a female employee in marketing made derogatory comments to other employees about Impastato on a regular basis. Impastato discussed this issue with her manager Anita King and was discouraged from reporting these issues to the HR department.

12. Impastato was told by King that it was very difficult at Pamlab for a woman to be promoted into management. King knew that was Impastato's goal. King said that if Impastato reported it to the HR department, Impastato would have less chance of being promoted. King also told Impastato that she had been present when many derogatory comments had been made towards women and about women from upper management at Pamlab.

13. In May of 2009, the VP of Sales came into King's office, to give her some confidential

information while Impastato was present. After he finished he turned to Impastato and told her that the information he was discussing was confidential. Impastato replied that she understood. He proceed to say "OK, because I know who you go to lunch with everyday" and nodded his head toward a black female that Impastato often spent her lunch hour with.

14. King had also told Impastato that she had been in the presence of management when racist off-color jokes or comments had been made by upper management at Pamlab and that Impastato should be careful who Impastato went to lunch with so Impastato could avoid any issues.

15. Impastato continued to seek the opportunity to be promoted throughout 2009.

16. In September 2009, Impastato interviewed for an inside sales position to attempt to better her opportunity for being promoted to management at Pamlab. Impastato was offered the position. After Impastato accepted the position Impastato was told that she would have to take a pay cut because she was making more money than most inside sales reps.

17. After complaining about this potential pay cut, the company informed her that her pay would not be cut, but that Impastato would not receive her annual 10% merit increase despite her excellent performance. Impastato accepted the condition with hopes Impastato would be able to make up the difference with her sales commissions.

18. In November 2009, her new manager Canta Wells and her administrative assistant Gwen were talking to Impastato about property in Well's mother's estate. She stated that her brother wanted to sell some of the estate property and that she and her other sibling did not want to sell the property. Wells stated that her brother he was acting a fool and that they were not going to act "black." Wells knew that Impastato's best friend was

black. Impastato was extremely offended and walked away.

19. In December 2009, Impastato received her 90 day performance evaluation from Wells, her new manager. In an office meeting, Wells expressed many positive things about Impastato's performance and sales numbers. Wells also expressed a concern with a couple of tardies that had taken place in her first 30 days in inside sales. Impastato explained that these tardies were caused by Impastato not sleeping well and sleeping through her alarm because of her depression. Wells said the situation had improved in the last 60 days. Impastato told her that she had taken extra precautions to be sure she did not sleep through her alarm. She said Impastato had a lot of marketing experience which Impastato used to help the team and was a good team player. They also discussed call average and doctor detail average.

20. When Impastato received a copy of the evaluation the next day, Impastato saw inaccuracies in the evaluation. Impastato asked Wells about all of the differences of their discussion compared to what she had put into writing on the evaluation. In addition to asking about other discrepancies, Impastato asked about the issue of tardiness. Wells told Impastato about a day the previous week she thought Impastato was late. The day she mentioned was actually a day when Wells was not at work that day at all but Impastato was present and on time. This was not the only time that Wells was less than truthful about Impastato being late.

21. Because Wells was discriminating against Impastato by writing false evaluations about her and being less than truthful about Impastato, Impastato filed a complaint with Lee Ingles, the Director of HR. Wells told Impastato's co-workers that she was not a team player and that she went above her head by sending an email to the VP of sales Kenny Ladner to request

permission to attend a medical conference. Both of these claims are false.

22. Although she asked Ingles several times in the next five months, Ingles only stated "they were working on the issue" but never gave any details on how Impastato's complaint would be resolved. During this period, Wells continued to make derogatory comments about Impastato to her co-workers.

23. In May 2010, during a company trip, Wells again made derogatory comments about Impastato to her co-workers. Impastato again reported this to Ingles. Impastato told Ingles that the harassment by Wells had gotten so bad that she was having difficulty sleeping at night. This complaint resulted in a meeting with Jim Hendry, VP of HR. Impastato complained to Hendry about the issues Impastato had with Wells and how it had progressed to the point where it was now affecting her depression. Impastato had been seeing her doctor for this and he prescribed sleeping medication.

24. Another meeting resulted with Wells' new manager Arlen Espinal, Hendry, amd Impastato. They discussed the issues Impastato had with Wells and how it was affecting her health. Hendry asked what Impastato would like to see happen. Impastato responded it would be best for her health to be placed under another manager on another inside sales team. He said he would need to speak with Wells before any decisions would be made.

25. In May, 2010, Treneka Young was told by Lykinda Warner in HR that she needed to stay away from Impastato because the company was trying to get rid of her.

26. In June 2010, Impastato was removed for the period of approximately 1 month from the direct supervision of Wells. During this period, Impastato reported to her manager, Espinal. During this month Impastato's work performance improved. Impastato was also told that

she was being considered for a more permanent placement after the sales quarter was over on June 30, 2010.

27. During this period, Impastato interviewed for an outside sales position in which Impastato was very qualified for and had more time with the company than any other inside sales rep interviewing. Impastato was denied this position.

28. On June 30 Impastato was told that effective the next day Impastato would again be reporting to Wells. Impastato asked Hendry why this was this decision was made when it would adversely affect her depression and especially since her health and work performance had improved during the last month. Hendry responded that the company felt this was best for Impastato.

29. In July 2010, under the direct supervision of Wells, Impastato's depression got worse. She was sent by her doctor to see a therapist.

30. On July 27, 2010, Impastato was written up by Kenny Ladner stating that Impastato disobeyed Espinal because Impastato allegedly spoke to Wells after she was asked never to speak with Wells without Espinal present. This was a false accusation. He also said Impastato had called Wells names and raised her voice to her. Impastato told him these accusations were all false.

31. The same day Espinal and Wells wrote Impastato up for poor performance, although Impastato made # 1 on her team for two of the products Impastato sold out of the four that Impastato sold for the previous quarter.

32. On August 3, 2010, Impastato's therapist and doctor recommended family medical leave for a period of at least 2 to 4 weeks. Impastato returned from medical leave, five working days

prior to being terminated on September 13th.

33. In August 2010, during her Family Medical Leave a district meeting was held. While traveling to lunch with Wells, Wells told Krisner Green, a co-worker of Impastato, that Pamlab planned to fire Impastato.

34. On September 7, 2010, an email was sent from Treneka Young to Impastato and 4 or 5 other people containing a link to an article in the local online newspaper. The article contained information regarding a local marijuana arrest that stated the street value of the marijuana seized from the arrest was worth over 36,000.00. Green a team member and friend had made a comment that basically stated that was crazy and not possible. Impastato then responded and said, "if that's the case, we are all in the wrong business." Other co-workers responded to this email, including Amanda Lyons.

35. At the end of the workday on September 13, 2010, Impastato was terminated in a meeting attended by Wells, Espinal, and Lykinda Warner. Espinal gave as a reason for termination that the email was not within the culture or beliefs of the company.

36. Lyons was not terminated for responding to this email. The reason given for the termination of Impastato was a pretext for discrimination based on her gender and disability.

37. Pamlab failed to accommodate Plaintiff's disability when it reassigned Impastato to work directly for Wells and when it terminated Impastato.

38. Impastato's depression is a disability as defined by the ADA and the ADAAA.

39. The acts of Defendant were practiced with malice and/or reckless disregard to Plaintiff's federally protected rights.

40. At all times relevant to this complaint, Impastato was "qualified" for her job.

41. Impastato was terminated because of her disability or because her impairment was perceived by Pamlab to be an impairment that is not both transitory and minor.

42. Impastato's impairment substantially limited one or more major life activities.

43. Impastato had a record of such an impairment.

44. As a direct result of the above acts of Defendant, Plaintiff has suffered pain and suffering, emotional distress, mental anguish, loss of reputation, embarrassment, and humiliation.

## VI. CAUSES OF ACTION

45. By the above acts the Defendant has violated Title VII of the Civil Rights Act of 1964 by discriminating against Plaintiff based on her gender by not promoting her and terminating her employment.

46. By the above acts the Defendant has violated the ADA and the ADAAA by failure to make reasonable accommodations for Plaintiff's disability and by terminating her employment because of her disability and because of retaliation for requesting accommodation for her disability.

## VII. PRAYER FOR RELIEF

47. **WHEREFORE**, Impastato prays that this Court:

a. Declare that the acts and practices complained of herein are in violation of United States law;

b. Enjoin and permanently restrain Defendant from engaging in such unlawful practices;

c. Award Plaintiff all earnings she did not receive because of Defendant's unlawful acts, including but not limited to back pay, pre-judgment interest, bonuses, pension,

and any other lost benefits;

d. Reinstate Plaintiff to the position she would have occupied but for the Defendant's discriminatory treatment, or in lieu thereof, award Plaintiff front pay.

e. Award Plaintiff compensatory damages for pain and suffering, emotional distress, mental anguish, loss of reputation, embarrassment, and humiliation;

f. Award Plaintiff punitive damages;

g. Award Plaintiff costs, expert witness fees, and attorney's fees;

h. Grant Plaintiff any such relief as this Court may deem just and proper.

**VIII. JURY DEMAND**

48. Plaintiff Jennifer Impastato demands trial by jury of all issues in this action.

                          Respectfully Submitted,

                          /s/ Victor R. Farrugia
                          VICTOR R. FARRUGIA (#19324) T.A.
                          Attorney At Law
                          2010 Energy Centre
                          1100 Poydras Street
                          New Orleans, LA 70143
                          Telephone: (504) 525-0250
                          vrfarrugia@igc.org

**PLEASE SERVE:**
Pamlab, LLC
c/o its agent for service of process:
ROBERT S. ROOTH
1100 POYDRAS ST., STE. 2300
NEW ORLEANS, LA 70163